**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| HANOVER INSURANCE COMPANY, )<br>)<br>     Plaintiff, )<br>)<br>v. )<br>)<br>CHICAGO ORNAMENTAL IRON, INC., )<br>JONATHAN SAMEK, and ENRIQUE )<br>MONTES, )<br>)<br>     Defendants. ) | Case No: |

**COMPLAINT FOR DECLARATORY RELIEF**

NOW COMES Hanover Insurance Company ("Hanover"), by and through its undersigned counsel, and for its Complaint for Declaratory Relief, pursuant to 28 U.S.C. § 2201, against Chicago Ornamental Iron, Inc. ("COI"), Jonathan Samek ("Samek"), and Enrique Montes ("Montes") (collectively, the "**Insureds**"), and states as follows:

## I. INTRODUCTION

1.     This lawsuit involves an insurance coverage dispute. Of relevance here, Hanover issued to COI two "claims made" Private Company Advantage Insurance Policies (collectively, the "Policies") for the Policy Periods of: (i) October 8, 2016-17 (the "First Policy"); and (ii) from October 8, 2017-18 (the "Second Policy"). Subject to its terms and conditions, each of the Policies afford coverage for **Loss** (*e.g.*, **Defense Expenses**, settlements, judgments) as a result of an "**Wage & Hour Claim** first made" during the **Policy Period**. A "**Wage & Hour Claim**" is defined to include any "civil proceeding commenced by the service of a complaint." The Policies each contain a separate $1 million Limit of Liability; however, with respect to any lawsuit alleging "**Wage & Hour Claim**," the Policies contains a "**Defense Expenses** only" Sublimit of $100,000 (and *not* $1 million).

Page 1

2762464v.1

2.      On April 28, 2017 – during the First Policy – two named plaintiffs (Rene Garrido and Sergio Patino) filed a lawsuit (the "Lawsuit") against the **Insureds** alleging "**Wage & Hour violation**" under the Fair Labor Standards Act (and various the Illinois state law claims), and specifically alleging "Class and Collective Allegations" and that the Lawsuit involves "approximately 30 to 40 other employees of Defendants that are similarly situated to Plaintiffs (hereinafter referred to as the 'Opt-In Employees')."

3.      After the **Insured** tendered the Lawsuit to Hanover, Hanover agreed to provide its duty to defend, subject to a reservation of rights, including the First Policy's $100,000 Sublimit for a **Wage & Hour Claim**.  During the Second Policy, an additional twenty-two (22) plaintiffs filed a Motion of Intervention in the Lawsuit seeking to "Opt-In" and on September 18, 2018, the Court granted the Motion, and thereafter twenty (20) plaintiffs executed "FLSA *Opt-In* Consent Forms" whereby these twenty plaintiffs were "*joining this lawsuit*," and each plaintiff "will be bound by any judgment of the court or by any settlement *of this lawsuit*" (emphasis added).

4.      Presently, Hanover has paid $100,000 in Defense Expenses related to the Lawsuit and thereby exhausted the First Policy's $100,000 Defense Expenses Only Sublimit.  However, based on the Intervention Motion (and other subsequent Motions) that have permitted additional plaintiffs to "Opt-In" to the Lawsuit, the **Insureds** have argued that these "Opt-In" plaintiffs: (i) are a new "**Claim**" thereby triggering coverage under the Second Policy; and/or (ii) have made additional and different allegations thereby making new and separate covered "**Claims**."

5.      Hanover has advised the **Insureds** that the "Opt-In" Motion is part of the same Lawsuit, or a "single **Claim**," and even assuming the "Opt-In" plaintiffs were a new "**Claim**" or asserted new allegations, the Policies each contain a "**RELATED CLAIMS**" provision, which expressly provides "all **Related Claims** will be considered as a single **Claim** made in the **Policy**

**Period**…*in which the earliest of such **Related Claims** was first made*…" (emphasis added), and the Policies define "**Related Claims**" to mean "all **Claims** based upon, arising from or in any way related to the same facts, circumstances, situations, transactions, results, damage or events or the same series of facts, circumstances, situations, transactions, results, damage or events."

6.      From the first day it was filed, the Lawsuit included express allegations for the potential addition of Opt-In Plaintiffs.  Accordingly, the actual intervention of these Opt-In Plaintiffs to the Lawsuit is not a new "**Claim**." Alternatively, even if the Opt-In Plaintiffs are deemed a new "**Claim**," the Opt-In Plaintiffs are certainly based on the "same facts, circumstances" (etc.), as the Lawsuit and, therefore, would be "**Related Claims**" and deemed first made during the First Policy and subject to the First Policy's $100,000 Sublimit.

7.      By letter dated July 31, 2019, Hanover requested that the **Insureds** withdraw its tender for coverage in excess of the First Policy's $100,000 Sublimit, and the **Insureds** have refused to do so.

8.      An actual controversy exists between the **Insureds** and Hanover regarding Hanover's purported obligation to pay for the Defense Expenses of the **Insureds** for the Lawsuit in excess of the First Policy's $100,000 Sublimit, or to provide any additional coverage for **Loss** arising from the Lawsuit, now that the sublimit is exhausted, and this controversy cannot be resolved without a declaration of the rights and responsibilities of the parties by this Court.

## II. <u>THE PARTIES</u>

9.      Hanover is a corporation organized under the laws of the State of Delaware with its principal place of business at 440 Lincoln Street, City of Worcester, in the Commonwealth of Massachusetts.

10.     Upon information and belief, COI is a corporation organized under the laws of the State of Illinois with its principal place of business in the State of Illinois at 1237-51 W 47th Street, Chicago, Illinois, 60609.

11.     Upon information and belief, Samek is a citizen of the State of Illinois.

12.     Upon information and belief, Montes is a citizen of the State of Illinois.

### III. JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 respecting diversity jurisdiction insofar as it involves citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Venue is appropriate under 28 U.S.C. § 1391 because a substantial part of the relevant events occurred in this district, including receipt of the Policies by COI, the named insured under the Policies, as well as being venue of the Lawsuit.

### IV. BACKGROUND FACTS

**A.      The Hanover 2016-17 Policy**

15.     Hanover issued to COI a Private Company Advantage Insurance Policy, policy number LHI-D042442-00 for the Policy Period from October 8, 2016 to October 8, 2017 with a limit of $1,000,000 (the "2016-17 Policy").  A true and correct copy of the 2016-17 Policy is attached hereto as Exhibit 1, and incorporated by reference herein.

16.     The 2016-17 Policy identifies six potential "Coverage Parts" (including the Directors & Officers and Entity Liability ("D&O") Coverage Part, the Employment Practices Liability ("EPL") Coverage Part, the Fiduciary Liability Coverage Part, the Cyber Privacy & Security Coverage Part, the Crime Coverage Part, and the Kidnap & Ransom Coverage Part); however, for the 2016-17 Policy, COI only purchased the EPL Coverage Part.

17.     Endorsement No. 1 to the 2016-17 Policy is entitled, "**WAGE & HOUR CLAIMS DEFENSE EXPENSE SUBLIMIT**," and contains a "**Wage & Hour Claim**" Sublimit that provides a "maximum limit of liability for **Defense Expenses**" of $100,000. Specifically, Endorsement No. 1 amends the 2016-17 Policy's Insuring Agreement, and provides:

A. Section I. Insuring Agreement is amended to include:

Wage & Hour Claims Defense Expense Coverage

The **Insurer** will pay on behalf of the **Insured**, **Defense Expenses** arising out of any **Wage & Hour Claim** first made against the **Insured** during the **Policy Period** or the Extended Reporting Period, if applicable.

The **Insurer's** maximum limit of liability for **Defense Expenses** resulting from any **Wage & Hour Claim** shall be $100,000 per **Policy Period** which shall be part of, and not in addition to, the Maximum Aggregate Limit of Liability shown in Item 3. of the EPL Declarations and shall be excess of a Retention of $10,000.

If a matter includes allegations constituting a covered **Employment Claim** and a **Wage & Hour Claim** then the sublimit above shall not apply and the Maximum Aggregate Limit of Liability shown in Item 3. of the EPL Declarations will apply so long as such **Employment Claim** remains part of such matter. If at the time such **Employment Claim** is no longer part of such matter then the sublimit above shall apply unless the amount of **Defense Expenses** incurred at such time exceeds the sublimit above. In this event, the **Insurer** will have no further obligation to pay **Defense Expenses** arising out of such **Wage & Hour Claim**.

B. For the purpose of coverage provided by this endorsement:

**Wage & Hour Claim** means:

A. Any:

1.     Written demand first received by an **Insured** for monetary or non-monetary relief including a written demand for reinstatement, re-employment, re-engagement or injunctive relief;

2.     Civil proceeding commenced by the service of a complaint or similar pleading;

3.     Formal administrative or regulatory proceeding commenced by the filing of charges, formal investigative order or similar document, including a proceeding before the Equal Employment Opportunity Commission or any similar governmental agency;

4.     Arbitration or mediation proceeding commenced by the receipt of a demand for arbitration or mediation or similar document;

which is brought and maintained by or on behalf of a past, present or prospective **Employee** or **Independent Contractor** of an **Insured Entity** against an **Insured** for an **Wage & Hour Violation**, including any appeal therefrom;

18.     Endorsement No. 1 defines "**Wage & Hour Violation**" to mean:

**Wage & Hour Violation** means an alleged or actual violation of the responsibilities, obligations and duties imposed by any federal, state or local statutory or common law anywhere in the world including regulations promulgated under any such law that governs wage, hour and payroll policies and practices, including but not limited to the Fair Labor Standards Act, as amended.

19.     Endorsement No. 1 also amends the exclusions section of the 2016-17 Policy, and

provides:

This insurance does not apply to **Loss** for any **Claim**:

For any violation or failure to comply with:

The responsibilities, obligations, or duties imposed by any federal, state or local statutory or common law anywhere in the world including regulations promulgated under any such law that governs wage, hour and payroll policies and practices, except the Equal Pay Act, including but not limited to the Fair Labor Standards Act, as amended. However, this exclusion shall not apply to **Defense Expenses** for any Wage & Hour Defense Costs Coverage as provided in paragraph A. of this endorsement.

20.     Section VI of the Common Terms and Conditions of the 2016-17 Policy contains

a "**RELATED CLAIMS**" provision, which expressly provides:

With respect to the **Liability Coverage Parts** all **Related Claims** will be considered a single **Claim** made in the **Policy Period** or Extended Reporting Period in which the earliest of such **Related Claims** was first made or first deemed to have been made pursuant to the applicable Coverage Part.  All **Related Claims** are subject to the Limits of Liability, Retention and other terms and conditions applicable to the earliest **Related Claim**.

21.     Section II of the Common Terms and Conditions of the 2016-17 Policy defines

"**Related Claims**" as the following:

**Related Claims** means all **Claims** based upon, arising from or in any way related to the same facts, circumstances, situations, transactions, results, damages or

events or the same series of facts, circumstances, situations, transactions, results, damage, or events.

**B.   The Hanover 2017-18 Policy**

22.    Hanover issued to COI a Private Company Advantage Insurance Policy, policy number LHI-D042442-02 for the Policy Period from October 8, 2017 to October 8, 2018 with a limit of $1,000,000 (the "2017-18 Policy").  A true and correct copy of the 2017-18 Policy is attached hereto as Exhibit 2, and incorporated by reference herein.

23.    The 2017-18 Policy identifies six potential "Coverage Parts" (including the D&O Coverage Part, the EPL Coverage Part, the Fiduciary Liability Coverage Part, the Cyber Privacy & Security Coverage Part, the Crime Coverage Part, and the Kidnap & Ransom Coverage Part); however, for the 2017-18 Policy, COI only purchased the EPL Coverage Part and the D&O Coverage Part.

24.    With respect to the 2017-18 Policy and its EPL Coverage Part, it contains a word-for-word identical Endorsement No. 1 as the 2016-17 Policy, which is also entitled "**WAGE & HOUR CLAIMS DEFENSE EXPENSE SUBLIMIT**," and similarly contains a "**Wage & Hour Claim**" Sublimit that provides a "maximum limit of liability for **Defense Expenses**" of $100,000.

25.    With respect to the 2017-18 Policy and its Common Terms and Conditions, it contains a word-for-word identical Section VI. entitled "**RELATED CLAIMS**" as the 2016-17 Policy, and identical definition of "**Related Claims**."

26.    In addition, with respect to the 2017-18 Policy and its D&O Coverage Part, Section IV.A.2. contains a "Prior & Pending Proceedings" Exclusion that provides:

This insurance does not apply to **Loss** for any **Claim**:…Based upon, arising out of or in any way related to any litigation…pending against any **Insured**…prior to or on the Prior

Page 7

& Pending Proceeding Date set forth in Item 5 of the D&O Declarations [*i.e.*, "10/08/2017"].

Item 5 of the D&O Declarations states, "**PRIOR & PENDING PROCEEDINGS DATES**… 10/08/2017".

27.     Endorsement No. 1 to the D&O Coverage Part of the 2017-18 Policy contains a "**PAST ACTS EXCLUSION**", which provides:

> This insurance does not apply to **Loss** for any **Claim** based upon, arising out of or in any way related to any **Wrongful Act** which occurred on or before 10/08/2017.

28.     Section IV.A.1. to the D&O Coverage Part of the 2017-18 Policy contains a "Prior Notice" Exclusion that provides:

> This insurance does not apply to **Loss** for any **Claim**: …Based upon, arising out of or in any way related to any **Claim**, **Wrongful Act**, investigation, proceeding, act, event, transaction, decision, fact, circumstance or situation which has been the subject of any notice accepted under any similar policy of which this Policy is a direct or indirect renewal or replacement.

29.     Section IV.B.4. to the D&O Coverage Part of the 2017-18 Policy contains an "Employment Practices" Exclusion that provides:

> This insurance does not apply to **Loss** for any **Claim**:…Based upon, arising out of or in any way related to any past, present or future actual or potential:
>
> a. Employment relationship including an employment-related **Wrongful Act**;
>
> b. Discrimination against or sexual harassment of any third party;
>
> c. Violation of federal, state, local or foreign wage and hour laws, including, without limitation, the Fair Labor Standards Act.

## C.     <u>The Lawsuit</u>

30.     On August 28, 2017, Plaintiffs Rene Garrido and Sergio Patino filed the Lawsuit against the **Insureds**, captioned: *Rene Garrido, et al. v. Chicago Ornamental Iron, Inc., et al.*, case no. 17-CV-3236, filed before the United States District Court for the Northern District of

Illinois, Eastern Division (the "Lawsuit"). A true and correct copy of the Lawsuit is attached as Exhibit 3, and incorporated by reference.

31.     The Lawsuit is brought pursuant to the "Fair Labor Standards Act, 29 U.S.C. 201 et seq.", the "Illinois Minimum Wage Law, 820 ILCS 105/1 et seq.", and the "Illinois Wage Payment and Collection Act, 820 ILCS 115/1 et seq.", and is brought based upon allegations of "Defendants' willful failure to compensate Plaintiffs for their overtime hours." Lawsuit, ¶1.

32.     The Lawsuit further expressly alleges that, "Defendants' unlawful compensation practices have denied Plaintiffs *and other similarly situated employees* their fairly earned wages." Lawsuit, ¶2 (emphasis added).

33.     The Lawsuit contains a section entitled, "**CLASS AND COLLECTIVE ALLEGATIONS**", and states, "*There are approximately 30 to 40 other employees of Defendants that are similarly situated to Plaintiffs (hereinafter referred to as the 'Opt-In Employees')*." Lawsuit, ¶28 (emphasis added).

34.     The Lawsuit further alleges:

> 32. At all times relevant to this Complaint, Plaintiffs were "employees" of Defendants as defined by the FLSA, the IMWL, and the IWPCA.
>
> 33. At all relevant times to this Complaint, *the Opt-In Employees* and the class member 'employees' of Defendants as defined by the FLSA, the IMWL, and the IWPCA.
>
> 36.  During the dates of their employment, Defendants directed Plaintiffs to work more than 40 hours per week.
>
> 37. During the dates of their employment, Defendants directed the *Opt-In Employees* and the class members to work more than 40 hours per week.
>
> 38. During the dates of their employment, Plaintiffs did in fact work more than 40 hours per week. At all relevant times to this Complaint, Plaintiffs worked approximately 60-65 hours a week…

39. During the dates of their employment, *the Opt-In Employees* and the class members did in fact work more than 40 hours per week. Upon information and belief, at all relevant times to this Complaint, *the Opt-In employees* and class members worked approximately 60-65 hours a week.

40. All of the overtime hours that Plaintiffs worked were done at the direction of Defendants.

41. All of the overtime hours that the *Opt-In Employees* and the class members worked were done at the direction of Defendants.

42. At all relevant times to this Complaint, Defendants had knowledge that Plaintiffs were working overtime.

43. At all relevant times to this Complaint, Defendants had knowledge that the *Opt-In Employees* and the class members were working overtime.

44. When Plaintiffs worked more than 40 hours in a given workweek, Defendants failed to pay them an hourly rate not less than one and a half times their regular hourly rate for all of their overtime hours.

45. When the *Opt-In Employees* and class members worked more than 40 hours in a given workweek, Defendants failed to pay them an hourly rate not less than one and a half times their regular hourly rate for all of their overtime hours.

46. During Plaintiffs' employment, Plaintiffs complained to Defendants about not receiving adequate compensation for the overtime hours they worked.

47. During the employment of the *Opt-In Employees* and the class members, the Opt-In Employees and class members complained to Defendants about not receiving adequate compensation for the overtime hours they worked.

48. Defendants informed Plaintiffs that if they did not work overtime, they would be fired.

49. Defendants informed the _Opt-In Employees_ and the class members that if they did not work overtime, they would be fired.

52. _Plaintiffs_ and the _Opt-In Employees_ are similarly situated.

(a) _Plaintiffs_ and the _Opt-In Employees_ had similar job duties. Plaintiffs and the Opt-In employees all worked as welders, metal cutters, metal finishers, or performed other similar work. Plaintiffs and the _Opt-In employees_ also all worked in the same building.

(b) _Plaintiffs_ and the _Opt-In Employees_ all had similar pay provisions. Plaintiffs and the Opt-In employees were all paid by the hour, and were threatened with being fired if they refused to work overtime.

(c) _Plaintiffs_ and the _Opt-In Employees_ were all victims of a single policy created by Defendants to deprive Plaintiffs and the _Opt-In Employees_ of their earned overtime wages. During weeks when Plaintiffs and the _Opt-In Employees_ worked in excess of 40 hours, Defendants employed the following tactics to achieve its unlawful policy:

(i) Defendants would reduce the hourly rate of _Plaintiffs_ and the _Opt-In Employees_ to avoid paying them at a rate of one and a half times their regular hourly rate. For example, Plaintiff Rene Garrido's regular hourly rate was $11 per hour. Exhibit 1. But, when Rene Garrido worked more than 40 hours a week, Defendants reduced his hourly rate to $10.50 per hour, thus compensating him at a rate of $15.75 per hour his overtime hours rather than the required $16.50 per hour. Exhibit 2.

(ii) Defendants failed to pay _Plaintiffs_ and the Opt-In employees a rate one and a half times their regular rate for either some or all of the overtime hours they worked. For example, only part of Plaintiff Rene Garrido's overtime hours were paid at the rate of $15.75 per hour, and some of his overtime hours were paid at a rate of $10.50 per hour and simply labeled "additional" pay on his pay stub. Exhibit 2. Plaintiff Sergio Patino was not paid an overtime rate, and the overtime hours that Defendants did pay him were only paid at a rate of $10.50 per hour and labeled "additional" pay on his pay stub. Exhibit 3.

(iii) Defendants refused to pay _Plaintiffs_ and the _Opt-In Employees_ altogether for some of the overtime hours they worked.

2762464v.1

> 53. *Plexiffs* and the *Opt-In Employees* all suffered from either some or all of the tactics described above that Defendants used to achieve their policy of avoiding properly compensating Plaintiffs and the Opt-In Employees for the overtime hours they worked.
>
> 54. Neither *Plexiffs* nor the *Opt-In Employees* worked for the Defendants in an administrative, professional, or executive capacity.
>
> 55. *Plexiffs* and the *Opt-In Employees* are not exempt from the overtime provisions of the FLSA.
>
> 56. Defendants' failure to pay *Plexiffs* and the *Opt-In Employees* at a rate of one and a half times their regular hourly rate for all the hours they worked in excess of 40 hours per week violated the FLSA.
>
> 57. Defendants' failure and refusal to pay overtime wages to *Plexiffs* and the *Opt-In Employees* was a willful violation of the FLSA.

(emphasis added).

35.     On September 18, 2018, twenty-two Intervening Plaintiffs filed "Intervening Plaintiffs' Motion to Intervene" in the Lawsuit (the "Motion").  In the Motion, the 22 Intervening Plaintiffs allege, "[t]he Intervening Plaintiffs' claims are similar to those of the existing named Plaintiffs, Rene Garrido and Sergio Patino, to the extent that for example, the Defendants reduced their hourly compensation rates to avoid paying all overtime wages," and that "[t]he Intervening Plaintiffs and Plaintiffs Garrido and Patino are all former or current employees of the Defendants who were not properly paid for the overtime hours that they worked," and that "[i]f this Court were to require the Plaintiffs and Intervening Plaintiffs to file individual actions, then a multiplicity of actions would result, creating a hardship to this Court and the Defendants."  A true and correct copy of the Motion is attached as Exhibit 4, and incorporated by reference.

36.     In the Lawsuit, on September 25, 2018, Honorable Rebecca R. Pallmeyer issued a Minute Order stating, "Plaintiffs' motion to intervene is denied without prejudice to appropriate

opt−ins to be submitted within fourteen (14) days." A true and correct copy of the Order is attached as Exhibit 5, and incorporated by reference.

37. In the Lawsuit, on October 9, 2018, twenty Plaintiffs separately filed "FSLA OPT-IN CONSENT FORMS," wherein they "Consent to be a Party Plaintiff," and:

> Thereby consent to be an Opt-In Party Plaintiff in the above captioned lawsuit against Chicago Ornamental Iron, Inc., its officers, directors, and any other individuals who may be personally liable for violations of the Fair Labor Standards Act, 29 U.S.C, §§ 201-219, and any other applicable laws. In the past three years, I worked as an hourly paid employee at Chicago Ornamental Iron, Inc. I understand that by joining this lawsuit, I will be bound by any judgment of the court or by any settlement of this lawsuit. I understand that I may choose any counsel to represent me if I decide to joint this action. I have had a reasonable opportunity to seek counsel of my choosing and I designate Villalobos & Associates to represent me in bringing such claim and authorize Villalobos & Associates to negotiate the terms of any settlement on my behalf.

A true and correct copy of one of the FSLA Opt-In Consent Forms is attached as Exhibit 6, and incorporated by reference.

38. With respect to the Lawsuit, as of the date of filing this Coverage Lawsuit, no Amended Complaint has been filed.

39. The Lawsuit constitutes a **Wage & Hour Claim** as this term is defined in both Hanover policies.

40. The Lawsuit is also a **Claim** seeking the payment of **Loss** for alleged violation of or failure to comply with duties imposed by statutes or the common law which govern wage, hour, and payroll policies and practices.

**D.**     <u>**Hanover Agrees to Defend the Lawsuit**</u>

41. The Insureds provided notice of the Lawsuit during the 2016-17 Policy, and Hanover agreed to provide and has provided a defense of the Lawsuit, subject to Endorsement

No. 1 and the Policy's $100,000 Sublimit which is the "**Insurer's** maximum limit of liability for **Defense Expenses** resulting from any **Wage & Hour Claim**."

42.     The Insureds have exhausted the $100,000 Sublimit for Defense Expenses in the defense of the Lawsuit.

43.     With the impending exhaustion of the Sublimit, Hanover communicated that it owes no further obligation to the Insureds to provide any defense or indemnity to them for the Wage & House Claim which is the subject of the Lawsuit.

44.     The Insureds have demanded coverage under the 2017-18 Policy for the Lawsuit notwithstanding Hanover's exhaustion of its Sublimit under the 2016-2017 Policy and notwithstanding the fact that no new and unrelated claim has been made by any new underlying plaintiff.

45.     An actual controversy exists as to whether Hanover has fulfilled its coverage obligation to the Insureds under the policies of insurance issued to them by Hanover, which controversy requires a legal determination by this Court.

**COUNT I**
**(Declaratory Relief: 2016-17 Policy)**
**(All Defendants)**

46.     Hanover incorporates and restates each and every allegation set forth in Paragraphs 1-45 of this Complaint as if alleged in this Paragraph 46.

47.     Pursuant to Endorsement No. 1 to the 2016-17 Policy (the "**WAGE & HOUR CLAIMS DEFENSE EXPENSE SUBLIMIT**"), the Lawsuit constitutes a "**Wage & Hour Claim**" and, therefore, the Lawsuit is subject to a Sublimit that provides the "**Insurer's** maximum limit of liability for **Defense Expenses** resulting from any **Wage & Hour Claim** shall be $100,000."

48.     Based on Endorsement No. 1, including both the articulated Sublimit for **Defense Expenses**, as well as the added exclusion for **Loss** arising from claims like those included in the Lawsuit, once Hanover paid $100,000 in **Defense Expenses** related to the Lawsuit, Hanover had no further obligations under the 2016-17 Policy to pay any further **Loss** and/or **Defense Expenses** for the Lawsuit.

49.     Because an actual controversy exists as to whether Hanover owes the Insureds any further coverage obligations under the 2016-17 Policy, the parties require a judicial determination by this Court regarding their respective rights and obligations.

**COUNT II**
**(Alternative Declaratory Relief: 2017-18 Policy)**
**(All Defendants)**

50.     Hanover incorporates and restates each and every allegation set forth in Paragraphs 1-49 of this Complaint as if alleged in this Paragraph 50.

51.     Alternatively, with respect to the EPL Coverage Part for the 2017-18 Policy, both EPL Insuring Agreement and Endorsement No. 1's Insuring Agreement only afford coverage for

a "**Claim** first made" or "**Wage & Hour Claim** first made" during the October 8, 2017-18 **Policy Period**. The Lawsuit was filed on April 30, 2017, and is *not* first made during the October 8, 2017-18 **Policy Period** and, therefore, is not covered under the EPL Coverage Part of the October 8, 2017-18 Policy.

52.     Alternatively, even if the addition of the Opt-In Plaintiffs constituted a new **Claim**, both the 2016-17 Policy and the 2017-18 Policy contains a "**RELATED CLAIMS**" provision and an identical definition of "**Related Claims**," and any such new **Claim** made during the 2017-18 **Policy Period** would be a "**Related Claim**" with the Lawsuit, and deemed "first made" when "the earliest of such **Related Claims** was first made," or during the 2016-17 **Policy Period** – and is therefore not covered under the 2017-18 Policy as it is not a claim "first made" during the 2017-18 **Policy Period**.

53.     Alternatively, with respect to the 2017-18 Policy and its D&O Coverage Part, the Policy's Insuring Agreements only afford coverage for a "**Claim** first made" during the October 8, 2017-18 **Policy Period**. The Lawsuit was filed on April 30, 2017, and is *not* first made during the October 8, 2017-18 **Policy Period** and, therefore, is not covered under the D&O Coverage Part of the October 8, 2017-18 Policy.

54.     Alternatively, with respect to the 2017-18 Policy and its D&O Coverage Part, the Prior & Pending Proceedings Exclusion bars coverage for any **Claim b**ased upon, arising out of or in any way related to any litigation pending against any **Insured** prior to or on October 8, 2017, and the Lawsuit was filed and pending as of August 28, 2017, such that the Exclusion applies to bar coverage for the Lawsuit.

55.     Alternatively, with respect to the 2017-18 Policy and its D&O Coverage Part, Endorsement No. 1 contains a "**PAST ACTS EXCLUSION**", which bars coverage for any

Page 16

**Claim** based upon, arising out of or in any way related to any **Wrongful Act** which occurred on or before October 8, 2017, and because the Lawsuit was filed on August 28, 2017 and contains allegations of Wrongful Acts before October 8, 2017, the Exclusion applies to bar coverage for the Lawsuit.

56.     Alternatively, with respect to the 2017-18 Policy and its D&O Coverage Part, Section IV.A.1. is a "Prior Notice" Exclusion that bars coverage for any **Claim** based upon, arising out of or in any way related to any **Claim**, **Wrongful Act**, investigation, proceeding, act, event, transaction, decision, fact, circumstance or situation which has been the subject of any notice accepted under any similar policy of which this Policy is a direct or indirect renewal or replacement," and Hanover accepted coverage under the 2016-17 Policy, such that the Exclusion applies to bar coverage for the Lawsuit.

57.     Alternatively, with respect to the 2017-18 Policy and its D&O Coverage Part, Section IV.B.4. contains an "Employment Practices" Exclusion that bars coverage for COI for any **Claim**:…Based upon, arising out of or in any way related to any past, present or future actual or potential: a. Employment relationship including an employment-related **Wrongful Act**, or violation of federal, state, local or foreign wage and hour laws, including, without limitation, the Fair Labor Standards Act – such that the Exclusion applies to bar coverage for the Lawsuit.

58.     Because an actual controversy exists as to whether Hanover owes the Insureds any further coverage obligations under the 2017-18 Policy, the parties require a judicial determination by this Court regarding their respective rights and obligations.

WHEREFORE, Hanover respectfully requests that this Court enter judgment in Hanover's favor and against **Insureds**, declaring that with Hanover's payment of the $100,000 in **Defense Expenses** related to the Lawsuit under the 2016-17 Policy, that Hanover has no further duty to

pay Defense Expenses for the defense of the **Insureds** related to the Lawsuit under the 2016-17 Policy and the 2017-18 Policy, and no duty to indemnify the **Insureds** related to the Lawsuit under the 2016-17 Policy and the 2017-18 Policy, and that this Court to grant Hanover such other and further relief as this Court deems just and equitable under the circumstances.

Dated: August 26, 2019    Respectfully submitted,

     By: /s/ James K. Thurston
      James K. Thurston
      Daniel Tranen
      Erik Tomberg
      **WILSON, ELSER, MOSKOWITZ,**
      **EDELMAN & DICKER LLP**
      55 West Monroe Street, Suite 3800
      Chicago, IL 60603
      Telephone: (312) 704-0550
      Facsimile: (312) 704-1522

      Counsel for Hanover Insurance Company